### HENDERSON v. SULLIVAN.

(Circuit Court of Appeals, Sixth Circuit. February 19, 1908.)

1. NUISANCE—STORAGE OF EXPLOSIVES.

The storage on an island in the Detroit river of tons of dynamite, which was liable to explode, and which did explode, constituted a nuisance.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Nuisance, §§ 15, 145.]

2. SAME—INJUNCTION.

The government, having spent millions of dollars in improving the Detroit river in the vicinity of Powder House Island, and having contracts for the further improvement of the river, contemplating an expenditure of $6,000,000 more, in which improvement large quantities of dynamite have been, and will be, used, and dynamite having been stored on such island in various quantities, without protest, for more than 25 years, an injunction would only be granted restraining the storage of dynamite on the island in such quantity as to create danger to complainant, who resided in the vicinity, or his family personally, or danger to his property located at his place of residence.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

Edwin Henderson, for plaintiff in error.

John H. Goff, for defendant in error.

Before SEVERENS and RICHARDS, Circuit Judges, and COCHRAN, District Judge.

RICHARDS, Circuit Judge. The defendant, Michael Sullivan, is a contractor, who for many years has been engaged under contract with the government in deepening and widening the channel in the

Detroit river, at a point commonly known as "Lime Kiln Crossing." This work necessitates the use of large quantities of dynamite for blasting the rock which forms the bed of the river at this point. It appears that this work is still going on, and there will likely be spent by the government in this neighborhood for this purpose about $6,000,000.

It appears from the record that prior to 1879 dynamite thus needed was stored on Fox Island, and in that year an explosion took place. The report made by the United States Assistant Engineer to Gen. Weitzel, then in charge of the work, leaves it to be inferred that the greater part of the nitroglycerin was stolen and a fire started to conceal the theft. Shortly after this explosion, along in the early 80's, Sullivan, then engaged in the contract work, with the consent of the government engineering officers, anchored a scow over what is known as Powder House Island, located in the Detroit river, about 2,000 feet from Grosse Isle, and used it in manufacturing and storing dynamite for the Lime Kiln Crossing work. After use for some years, the scow was sunk in the shallow water and the present island was built up, largely with rock excavated from the Lime Kiln Crossing. After thus constructing the island, some shanties were built and these were used, with the knowledge and consent of the government engineering officers, for the storage of dynamite needed in the government work. The shanties were insubstantial structures. One witness said you could throw a cat through the cracks. Dynamite required for the government work was no longer manufactured but brought there and stored. On the 27th of June, 1906, about 20 tons were stored, of which 500 or 600 boxes, or from 10,000 to 12,000 pounds, belonged to the defendant, the balance to the Dunbar & Sullivan Dredging Company in which he was interested.

On the afternoon of the day mentioned, the dynamite exploded from no known cause. At the time of the explosion, the complainant, Henderson, occupied 25 acres of land on Grosse Isle fronting on the Detroit river, and about 3,800 feet from Powder House Island. The residence was a summer one, but was used from time to time throughout the entire year. The force of the explosion shattered the windows in the house, and severly shocked the members of his family who were living there at the time. Similar injury was done to dwellings on Grosse Isle and elsewhere as near as the complainant's to the explosion. Slight injuries were inflicted on several people but nothing of a serious nature. Two boys were fishing in a sailboat in the river near Powder House Island when the dynamite exploded. Their boat was blown to pieces, but the boys were rescued without any serious injury.

The Detroit river is nearly two miles wide at the point where the explosion occurred. There are several channels for boats of considerable draught, while the whole river is used for pleasure craft, sail boats, motor boats, fishing boats, etc. One channel runs between Stony Island and Grosse Isle which passes quite near to the Powder House Island and joins the Sugar Island channel a few hundred yards below it. The Sugar Island channel passes from the head of Bois Blanc Island to Sugar Island, crossing the main stream at a distance form Powder House Island estimated from 80 to 800 feet. The main ship channel

lies a half mile or more to the east of Powder House Island, passing between Bois Blanc Island and the Canadian shore. The Sugar Island channel described was navigated at the time of the explosion by two large side wheel steamers engaged in the excursion business between Detroit and Toledo. One of them passed the scene within half an hour of the explosion. The force of the explosion destroyed the shanties containing the dynamite but they have since been replaced by permanent structures, and no doubt large quantities of dynamite will be stored there unless the court intervenes. The case was brought in the state court but removed to the court below where, after a hearing of the complaint, in which it was prayed the defendant be permanently enjoined from storing at any point in the Detroit river, and particularly in any building or buildings situated on Powder House Island, any dynamite or other mixture of nitroglycerin or high explosive, the bill was dismissed. There was no opinion. From this decree an appeal was taken to this court.

The Detroit river being a navigable stream and public highway, the complainant contends that the erection by the defendant, although with the consent of the government engineers, of the island now known as "Powder House Island," and the construction thereon of a powder house as described, constituted a trespass, and the storage on the island in the powder house of large and dangerous quantities of dynamite which exploded, damaging property and imperiling lives, and the contemplated storage of similar quantities there in the future, constitutes a public nuisance, the continued existence of which may and should be enjoined. On the other hand, the defendant insists that an injunction is a matter of grace and not of right (Edwards v. Allouez Mining Co., 38 Mich. 50, 52, 31 Am. Rep. 301); that the use of dynamite in this part of the river is necessary in connection with the contemplated improvement, and it must be stored some place; that this island has been approved by the government through its engineering officers, as a suitable place for storing dynamite, and the contract contains regulations to protect persons and property in the neighborhood from the result of such storage. It is therefore insisted that no case is presented which requires or warrants an injunction so broad as that prayed for.

We are inclined to question the legality of the occupation and improvement of Powder House Island by the defendant under the circumstances. It appears from the record that the land now occupied by Powder House Island was once submerged. We understand the title to such soil was in the state or the riparian owners. The matter was thoroughly discussed in the recent case of the United States v. The Chandler-Dunbar Water Company, 152 Fed. 25, 81 C. C. A. 221, 234, affirmed by United States Supreme Court 209 U. S. 447. 28 Sup. Ct. 579, 52 L. Ed. ——. No formal action appears to have been taken by the government or any officer thereof, giving the defendant the right to erect the island and construct the powder house on it. All that was shown was at most a verbal permission and an acquiescence on the part of the government officers in charge of the Lime Kiln Crossing work. We are also inclined to the view that the storage on Powder

House Island of tons of dynamite which the record shows is liable to explode, and which did explode, though fortunately with small damage, is probably sufficient to constitute a nuisance.

Respecting the general character of a nuisance, the Supreme Court, speaking by Mr. Justice Field, says in Bal. & Potomac & R. R. Co. v. Church, 108 U. S. 317, 329, 2 Sup. Ct. 719, 726, 27 L. Ed. 139:

"That is a nuisance which annoys and disturbs one in the possession of his property, rendering its ordinary use or occupation physically uncomfortable to him."

In the case of Laflin & Rand Powder Co. v. Tearney, 131 Ill. 322, 23 N. E. 389, 7 L. R. A. 262, 19 Am. St. Rep. 34, an action to recover damages for injuries to the residence and outhouses of the plaintiff below from the explosion of a powder magazine, the court held that, since the magazine was constructed on a smaller lot than the ordinance required, it was an illegal structure; the fact that it exploded showed it was dangerous, and the destruction of the plaintiff's dwelling by the explosion was convincing on the point that the storing of gunpowder in the magazine constituted a nuisance per se.

In Hazard Powder Co. v. Volger, 58 Fed. 152, 7 C. C. A. 130, the Circuit Court of Appeals for the Eighth Circuit had before it the result of the explosion of a powder magazine located in violation of a city ordinance, near the outskirts of Cheyenne. It held that its location constituted the magazine a nuisance per se, and made its owner liable for all injuries resulting from its explosion from whatever cause, whether negligent or not.

In Wilson v. Phoenix Powder Mfg. Co., 40 W. Va. 413, 21 S. E. 1035, 52 Am. St. Rep. 890, the plaintiff who lived in Burlington, Ohio, opposite a point in West Virginia, where the powder mill of the defendant was located, sued for damages on account of injuries caused by an explosion there. The mill was located near the Ohio river and between it and the Chesapeake & Ohio Railway. It exploded a number of times and occasioned great damage to property, both in West Virginia and Ohio. The court held that the conduct of so dangerous a business in such a location near two great public highways, within reach of many residences and places of business, constituted a public nuisance, and those injured by an explosion could recover without averring and proving negligence.

Another case in the same line is that of the Bradford Glycerin Co. v. St. Marys Woolen Mfg. Co., 60 Ohio St. 560, 54 N. E. 528, 45 L. R. A. 658, 71 Am. St. Rep. 740. Here the court held that nitroglycerin is a substance usually recognized as a high explosive and dangerous, the storage of which at any place is a constant menace to the property and lives in the vicinity. The court held that one who stores it on his own premises is liable for injuries caused to surrounding property by its exploding, although he neither violated any provision of law regulating its storage nor is chargeable with negligence. This case discusses and follows the leading case of Fletcher v. Rylands, 1 Exch. L. R. 265. The rule laid down by Mr. Justice Blackburn in this case was that "the person who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief if it escapes must keep it in

at his peril, and, if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape."

In the case of Gorham v. Gross, 125 Mass. 232, 28 Am. Rep. 224, and Mears v. Doles, 135 Mass. 508, this general rule of law, expressed by Mr. Justice Blackburn, was approved and followed. In the first case, a defendant was made liable for excavating his land so as to let in the sea, which undermined the land of his neighbor, injuring a well by the percolation of salt water into the same. In the second, a landowner was held liable for injuries resulting from the construction of a wall which fell and injured the property of an adjacent proprietor.

The recent case of Flynn v. Butler, 189 Mass. 377, 75 N. E. 730, was an action for personal injuries resulting from the explosion of gunpowder and dynamite stored in a populous neighborhood. There were two magazines involved, one built in 1876 and the other in 1885 A verdict was directed for the defendant. There was a reversal. The case grew out of the same explosions described in Oulighan v. Butler, 189 Mass. 287, 75 N. E. 726. The court, Braley, J., delivering the opinion, held that under proper instructions, the jury could have found that these magazines, being maintained in a populous neighborhood and likely at any time to explode, constituted a nuisance. A large number of cases are cited, page 386 of 189 Mass., page 731 of 75 N. E.

In Commonwealth v. Kidder, 107 Mass. 188 (one of the cases cited), the court by Judge Gray, afterwards Associate Justice of the Supreme Court of the United States, held that the keeping of gunpowder, naphtha, or other explosive substances in such quantities and places as to be dangerous to the persons and property of the inhabitants of a neighborhood might constitute a nuisance at common law, and this general rule was extended to the keeping of petroleum so as to emit offensive vapors.

An explosion of nitroglycerin was before this court in the case of Bradford Glycerin Company v. Kizer, 113 Fed. 894, 51 C. C. A. 524. It appears that in this case the nitroglycerin exploded spontaneously while the plaintiff was preparing to use it in shooting an oil well. The jury were instructed that if they found the nitroglycerin exploded spontaneously, and that pure nitroglycerin does not so explode, they might take that into consideration in determining whether the nitroglycerin was not impure. In other words, the explosion of the nitroglycerin, when no cause was shown, might be taken as a proof of negligence.

We have cited a number of cases holding that the storing of dynamite, or other explosives, in a populous neighborhood in such a way as to prove a menace to the property and lives of the inhabitants, would constitute a nuisance, per se. There are, however, a number of cases in this country which hold the contrary. Thus, in Tuckachinsky v. Coal Company, 199 Pa. 515, 49 Atl. 308, where the explosion of dynamite was caused by lightning, and where the magazine, when established, was not in a populous neighborhood, but buildings were erected near it subsequently, and where the quantity stored was small, the court sustained instructions for the defendant on the ground that the evidence showed no negligence.

In the case of Marshall v. Welwood, 38 N. J. Law, 339, 20 Am. Dec. 394, the Supreme Court of New Jersey held that the owner of a steam boiler, which he had in use on his own property, was not responsible, in the absence of negligence, for the damages done by its bursting. The case of Fletcher v. Rylands, already cited, was discussed and over-ruled.

In the case of Kleebauer v. Western Fuse Company, 138 Cal. 497, 71 Pac. 617, 60 L. R. A. 377, 94 Am. St. Rep. 62, it was held a fuse factory incidentally used for the storage of powder, which was exploded by the criminal act of an employé, where no negligence was shown, did not constitute a nuisance.

In Dumesnil v. Dupont, 18 B. Mon. (Ky.) 800, 68 Am. Dec. 750, the court refused to abate a powder magazine as a nuisance per se, over-ruling the Tennessee case of Cheatham v. Shearon, 1 Swan, 213, 55 Am. Dec. 734, in which it was held that a powder house located in a populous part of the city, and containing large quantities of gunpowder stored therein, is per se a nuisance.

The Cases of Kinney v. Koopman & Gerdes, 116 Ala. 310, 22 South. 593, 37 L. R. A. 497, 67 Am. St. Rep. 119, and Rudder v. Koopman & Gerdes, 116 Ala. 313, 22 South. 601, 37 L. R. A. 489, grew out of explosions of large quantities of dynamite and gunpowder which were stored in a wooden building in the business part of the town of Cullman. A building near the defendants' took fire, was consumed, and the fire communicated to the defendants' building, consuming it and exploding the dynamite and gunpowder. The damages sued for were caused by the explosion. In the first case, the court held that it was not sufficient merely to charge the storing of the gunpowder and the resulting explosion. It must also be averred that the explosive was stored in such a place and under such surrounding circumstances that it was dangerous.

In the second case, the Rudder Case, the court in its opinion (page 359 of 116 Ala., page 601 of 22 South. [37 L. R. A. 489]) states that the defendants stored large quantities of dynamite and gunpowder in their wooden building in a thickly settled portion of the town, so it was liable to explode and do serious injury to persons and property. The resulting explosion threw fire brands several hundred feet, setting fire to and destroying the plaintiff's property. The court held that on proof of these facts the defendants were responsible.

A large number of cases on the storage of gunpowder, dynamite, and other explosive and dangerous substances are collated in the notes to section 384 et seq. of Joyce on Law of Nuisance. It is unnecessary to comment on them at length. The line of distinction shown in the leading cases to which we have referred grows out of whether the storage constituted a nuisance per se, or not. One line of cases follow-ing the rule laid down by Mr. Justice Blackburn in Fletcher v. Ry-lands holds that dynamite is a dangerous substance, which is stored at the owner's risk, and constitutes a nuisance per se. The other line, while not denying that dynamite is a dangerous substance, holds that it is not sufficiently dangerous, under all circumstances, to make the owner who stores it responsible for every explosion, from whatever

cause. To make him responsible some negligence must be shown either in the quantity stored or in the manner of storage, or in the locality where stored. In the cases we have referred to where the storage was not held to constitute a nuisance per se, a careful study of the cases shows that each was distinguished by acts which justified the holding. Thus, in the Pennsylvania case (Tuckachinsky v. Coal Company), the explosion was caused by lightning. In the California case (Kleebauer v. Western Fuse Company), it was the result of the criminal act of an employé. In the Kentucky case (Dumesnil v. Dupont), the suit was brought to abate a powder house as a nuisance, so there was no explosion. The case was decided in 1857, when powder magazines were regarded as probably soon to be very useful things.

The following rule has been laid down by the War Department for the government of contractors, such as the defendant:

"41. Explosives—Explosives shall be stored in a bullet proof building or boat at a point remote from buildings with a conspicuous sign displayed thereon, indicating danger and the character of material stored therein. The nearest buildings are about 1,500 feet distant from the work, and the contractor shall so regulate the use of explosives that no damage to adjacent property will result therefrom. However, should such damage be caused in any way by the contractor's operations, he must assume all responsibility for the settlement of claims resulting from such damage."

It remains to be determined whether the decree of the lower court, which refused an injunction and dismissed the bill, ought to be affirmed. We think the record might possibly warrant an injunction, if properly limited, but we find little assistance in the complaint, or in the record, if we should reach that conclusion. In the first place, as to the prayer. It is that the defendant be enjoined from storing dynamite on Powder House Island or any place in the Detroit river. There is no limitation requested as to manner or place. We are asked to prohibit the storage of dynamite in any manner and at every place in the Detroit river. If that can be done because the river is a public highway, the reason would include every navigable stream, every railroad and every street or highway. We think this is going too far. It places an unnecessary bar against greatly needed public improvements. On the argument, the only place suggested where dynamite might be stored for use in the contemplated improvements of the Detroit river, was a barge in Lake Erie, where it would be inaccessible in stormy weather, and in Canada, where there was no assurance that storage would not be prohibited, and at any rate would be beyond the jurisdiction of the court. And yet the government has spent millions of dollars in improving the Detroit river in this vicinity, and has contracts on hand, or in view, which will require an expenditure of some $6,000,000 more. In this work enormous amounts of dynamite have been and will be used. As shown by the record, this work has been going on for more than 30 years, and it does not appear that any life has been lost or property seriously damaged through the storage of dynamite, though a number of windows have been smashed. Moreover, it does not appear that before this explosion, and for more than 25 years, any complaint about or protest against the storage of dynamite on Powder House Island, was made by any of the residents, although there was an explosion on Fox Island about 1879.

It is not necessary for us to consider the fact that so far as the record shows, the complainant himself is not really a landowner, nor now a lessee, his lease having expired on May 1, 1907, and no renewal or extension being made.

We think it apparent from the record that a reasonable amount of dynamite, for use in the public work, might be stored on Powder House Island, without injuring persons and property in the neighborhood, and to the great interest of the public in the doing of the improvement of the Detroit river now going on, and so we think that, under proper limitations, an injunction ought to be granted; the judgment of the court below is therefore reversed and the case remanded, with instructions to grant an injunction restraining the defendant from storing dynamite on the island or place described in the bill as the place where the defendant had recently been storing it, in such quantity as to create danger to the complainant or his family personally, or danger to the property, real or personal, owned by or possessed by him, at the place described in the bill as his residence on Grosse Isle.